UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-61390-CIV-WILLIAMS

CARLOS CABRERA,

      Plaintiff,

vs.

GOVERNMENT EMPLOYEES
INSURANCE COMPANY, *et al.*,

      Defendants.

_____/

## SEALED ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

**THIS MATTER** is before the Court on Defendant Government Employees Insurance Company's ("GEICO") Motion for Summary Judgment (DE 96) to which Plaintiff filed a Response (DE 140) and GEICO filed a Reply (DE 143). For the reasons set forth below, GEICO's Motion for Summary Judgment (DE 96) is **GRANTED.**

## I.    BACKGROUND

The undisputed facts are as follows. As part of its business, GEICO, an insurance company, pursues subrogation claims against purported tortfeasors (DE 97 ¶¶ 5, 7). In an effort to recover money GEICO has paid as a result of a car accident involving an insured, adjusters within GEICO's subrogation department send letters and personally place calls to the purported third-party tortfeasors (DE 97 ¶ 9). GEICO's subrogation department does not make calls using automated dialing equipment or an artificial or pre-recorded voice (DE 97 ¶¶ 16-17). When GEICO's subrogation department determines, based on the facts and circumstances of each claim, that it has exhausted its internal recovery efforts, GEICO adjusters may refer claims to third-party

collection agencies, like Defendant Bell, LLC ("Bell") (DE 97 ¶¶ 10-12).   GEICO adjusters are assigned to specific collection agencies, such as Bell, and the adjusters have the discretion to refer claims to their assigned collection agency as they see fit (DE 140-2, Bouvier Dep. 33:10-14; DE 140-1, Bateman Dep. 17:15-18:19, 52:1-9).   GEICO adjusters refer claims to Bell by e-mailing Bell a referral sheet containing information GEICO has collected regarding the tortfeasor, such as (1) the torfeasor's name; (2) the tortfeasor's phone number; (3) the amount GEICO is seeking to recover; and (4) details about the accident.[1]   (DE 140 at 3-4; Bateman Dep. 35:17-36:21, 45:8-14, 71:14-19; Bouvier Dep. 20:2-21:18, 57:22-24.)   GEICO does not include any instructions with the referral form (Bateman Dep. 45: 19-24) and Bell plays no role in determining the amount of money purportedly owed by a tortfeasor (Bouvier Dep. 23:6-14).

Although Bell considers GEICO a client, there is no contract setting forth the parties' relationship (Bouvier Dep. 25:22-26:7; 30:5-10, 32-33; Bateman Dep. 46:11-13). According to Mr. Bouvier, Bell's managing director, Bell receives 33% of any funds it recovers on a GEICO claim (Bouvier Dep. 33:11-16).   As part of Bell's standard collections practice, Bell's employees place phone calls to the referred tortfeasors to recoup monies owed (Bouvier Dep. 76:12-25).  Prior to allowing its employees to place calls, Bell trains its employees on its "strictly applied" process to recover funds (Bouvier Dep. 102:10-106:11).  For example, Bell provides its employees with a "Columbo list" – a list of questions Bell expects its employees to ask during their first contact with a

---

[1] If the number provided by GEICO turns out to be invalid, Bell's managers and employees will decide, on a file-by-file basis, whether to perform a skip trace to identify the person's correct phone number (Bouvier Dep. 92:12-95:13).

purported tortfeasor (Bouvier Dep. 106:19-107:12).[2]   This training lasts for approximately one month and includes training on the rules and regulations Bell believes applies to its business (Bouvier Dep. 103:13-104:9).   Bell's managers and assistant managers monitor the phone calls made by Bell's employees by listening in and by physically walking behind and watching over the employees as they place calls (Bouvier Dep. 108:1-109:10).

Bell's employees and managers decide, on a file-by-file basis, how many calls to place to the purported tortfeasor (Bouvier Dep. 82:5-12).   In addition to manually placing calls, Bell also used LiveVox, a non-attended dialing system, to place calls and leave a pre-recorded message (Bouvier Dep. 117:1-118:2).   Bell's managers decided which files would be serviced by LiveVox (Bouvier Dep. 120:1-12, 122:20-123:2).   Beginning in October 2012, Bell ceased using LiveVox and decided to increase the number of manual dials placed by Bell's employees (Bouvier Dep. 81:23-82:4, 132:23-25).   If Bell receives a complaint about calls placed by its employees, Bell "take[s] steps to correct it, identify it, train, and get past it."   (Bouvier Dep. 143:5-144:21.)   In the event a Bell employee handles a call poorly, Mr. Bouvier reviews the call with employee (Bouvier Dep. 146:13-147:3).

---

[2] GEICO did not provide Bell with any instructions, manuals, or policies relating to the TCPA (Bateman Dep. 57:25-58:4).   GEICO does, however, provide all of its vendors with a notice of vendor expectations that the vendor is expected to sign (Bateman Dep. 58:5-17).   According to GEICO, the purpose of the vendor expectation form is not to monitor GEICO's vendors but to make sure they are handling their business in a professional manner (Bateman Dep. 59:17-21).   The parties have not provided the Court with a copy of the notice of vendor expectations and none of the parties have pointed to the vendor expectation form as evidence of an agency relationship. Nevertheless, the Court notes that "[a]greeing to act according to an entity's rules, however, is not the same as agreeing to act under that entity's control" and is not, in and of itself, evidence of an agency relationship. *United States v. Tianello*, 860 F. Supp. 1521, 1525 (M.D. Fla. 1994).

3

GEICO is not involved in the process or methods Bell uses to recover funds (Bouvier Dep. 41:8-16).[3]  GEICO does not give Bell instructions regarding how to collect funds and they did not discuss the specifics of how Bell attempts to recover funds (Bouvier Dep. 41:8-21; Bateman Dep. 12:20-24,[4] 29:17-21,[5] 33:16-35:13,[6] 74:10-15). And Mr. Bouvier does not know if any Bell employee ever discussed Bell's use of LiveVox with GEICO (Bouvier Dep. 133:17-134:4).  However, GEICO does have the ability to sign-on to Bell's website and view an activity log containing a list of the actions Bell has taken on a particular claim (Bouvier Dep. 68:13-69:7; Bateman Dep. 42:2-20). The activity log indicates if calls have been made, if a letter has been sent, and contains notations made by Bell's employees (Bouvier Dep. 68:13-69:7, 125:9-126:5).

GEICO has received complaints about Bell's recovery methods (Bateman Dep. 30:24-31:5).  On occasion, GEICO will direct Bell to close a file and Bell will comply by

---

[3] "Q: [W]as there an understanding between Bell and GEICO as to how Bell would carry out its business?  A:  Okay. No.  You know, if you're asking me if GEICO was involved, whether it'd be defendant GEICO or claims center GEICO was involved in our process, the answer is no; or was knowledgeable, but probably is no."

[4] "Q: Do you know what methods those third parties use to collect on the subrogation claims? A: No.  Q: Do you know if they send letters? A: I don't know what they do."

[5] "Q: In what manner does Bell go about collecting GEICO subrogation claims? . . . A: I have no knowledge of how they collect their debt."

[6] "Q: When you would give your – when you would refer a file to Bell, what did you expect that they would do? . . . A: Recover money. Q: How? A: However their business model allowed them to handle it. . . . Q: You would refer to these claims – your employees would refer these claims to third parties and you had no idea what those third parties were doing to collect money?  Q: I remind you that you're under oath when you answer these questions.  A: I understand.  I don't know the exact things that they did.  I don't – I never had the interaction with them to discuss the methods in which they went about recovering money.  Can I assume that they made outbound calls?  Sure. Can I assume that they sent letters? Sure.  Did I go to their facility to witness that happen? No, I did not.  Did I listen to any calls to know if they were inbound or outbound? No, I did not.  So I don't know for sure what they did."

closing the file and taking no further action on the claim (Bouvier Dep. 43:14-44:5, 64:1-16).  After receiving complaints about Bell, a GEICO employee spoke with Mr. Bouvier and explained that she felt that Bell "was not conducting [its] business well."  (Bouvier Dep. 147:22-148:4).  Mr. Bouvier disagreed, stating that one of the calls at issue "wasn't unprofessional.  It wasn't threatening, and it wasn't, in my opinion, horrific or anything that would have been thought that way."  (Bouvier Dep 147:22-148:12.)  However, "there were some things in the call that I would have – we instructed the people as to handle differently in the future because we didn't like the way it was done."  (Bouvier Dep. 148:3-12.)  Mr. Bateman, GEICO's corporate designee, also discussed the call with Mr. Bouvier (Bateman Dep. 43:20-44:18).  Mr. Bateman testified that he did not instruct or direct Bell to behave differently or to conduct its business in a particular manner; rather, the conversation was a more general discussion on professionalism (Bateman Dep. 44:4-18).

Plaintiff Carlos Cabrera was involved in an automobile accident in May 2010 (DE 1 ¶ 19; DE 11 ¶ 19).  Following the accident, GEICO's subrogation department sent two letters and manually dialed Plaintiff's cell phone in an effort to recover money GEICO had paid to its insured as a result of the accident (DE 97 ¶¶ 13-14).[7]  Plaintiff does not have a residential telephone line (DE 97 ¶ 24).  GEICO subsequently referred Plaintiff's file to Bell which resulted in Plaintiff receiving more than 120 calls featuring a pre-recorded message (DE 137-1 ¶ 5).  This lawsuit followed.

Plaintiff brings this action, on behalf of himself and all others similarly situated, against Defendants GEICO and Bell under the Telephone Consumer Protection Act

---

[7] Plaintiff cannot recall if he actually received the letters (DE 137-2 ¶¶ 13-14).

("TCPA"), codified at 47 U.S.C. § 227, *et seq.*   GEICO has moved for summary judgment on the grounds that Plaintiff lacks standing to pursue any claims under 47 U.S.C. § 227(b)(1)(B) because Plaintiff does not have a residential line.  GEICO has also moved for summary judgment on the grounds that:  (1) Plaintiff has failed to plead vicarious liability in his Complaint; (2) the TCPA does not recognize a cause of action under § 227(b) based on a theory of vicarious liability; and (3) even if Plaintiff could proceed under a theory of vicarious liability and had plead it in his Complaint, GEICO is entitled to summary judgment because no agency relationship existed between GEICO and Bell.  In response, Plaintiff argues that he has standing to pursue claims on behalf of individuals with residential lines, that the TCPA permits causes of action based on vicarious liability, that Plaintiff adequately plead vicarious liability, and that summary judgment in GEICO's favor is inappropriate.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other

materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted). At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Finally, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a sufficient showing to establish the existence of an element essential to [his] case, and on which [he] will bear the burden at trial.'" *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Thus, "[i]f the non-movant . . . fails to adduce evidence which would be sufficient . . . to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).[8]

## III.   DISCUSSION

### A. Plaintiff Lacks Standing To Pursue Claims Under 47 U.S.C. § 227(b)(1)(B)

It is undisputed that Plaintiff does not have a residential telephone line and never received any calls on a residential line. GEICO argues that because Plaintiff does not have a residential line, Plaintiff lacks standing to pursue any claim, individually or on

---

[8] Typically, district courts rule on class certification motions before deciding summary judgment. However, as the Eleventh Circuit has held, the district judge has the discretion to reverse the order of things and "to consider the merits of the [plaintiff's] claims before [ruling on] their amenability to class certification." *See Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333, 1343 (11th Cir. 2000).

behalf of the putative class, under 47 U.S.C. § 227(b)(1)(B), which regulates calls to residential lines. (DE 96 at 10-11.)  In response, Plaintiff states that he "brought claims under Section 227(b)(1)(B) to protect Class members who received on their landlines the very same calls he received on his cell phone, not to obtain individual relief for himself under that provision." (DE 140 at 7.)  GEICO counters that a party's desire to represent a class "is no substitute for standing." (DE 143 at 4.)  The Court agrees.

Standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claim.  *See Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005).  Whether a party has standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The "irreducible constitutional minimum" to establish standing under Article III requires:  (1) injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to the defendant's challenged action; and (3) redressability.  *Id.* at 560-61.  A plaintiff suffers injury under Article III when there is a violation of a legally protected interest. *Id.* at 560. As the party invoking federal jurisdiction, Plaintiff bears the burden of establishing each of these elements. *Id.*

Plaintiff concedes that he does not have standing to bring a claim under 47 U.S.C. § 227(b)(1)(B), which makes it unlawful for any person "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party," because he does not have a residential line.  (DE 140 at 7-8.)  Nonetheless, Plaintiff argues he may "represent individuals who have claims under other provisions of the act so long as they

are based upon the same offending calls and experiences." (DE 140 at 7-8.)   In Plaintiff's view, the fact that § 227(b)(1)(B) only applies to landlines whereas § 27(b)(1)(A)(iii) only applies to cellular telephones is a distinction without a difference. (DE 140 at 9.) This argument is without merit. "Practical realities" as well as the plain language of the TCPA "support a distinction between residential and cellular lines." *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1320 (S.D. Fla. 2012).  The TCPA's residential calls prohibition is contained in a different subsection than the cellular call prohibition and different exemptions apply to calls made to residential lines than those applicable to calls made to cellular telephones.

It is well-settled that prior to certifying a class, the Court "must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). Only after the Court determines the claims "for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987).  Accordingly, "each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.'" *Id.* at 1483; *see also Prado-Steiman*, 221 F.3d at 1266; *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1347 (11th Cir. 2001) ("Without individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class.").

Because Plaintiff does not have a residential line, and therefore suffered no injury arising out of any alleged violation § 227(b)(1)(B), Plaintiff does not have standing to assert any claim, individually or on behalf of the putative class, under § 227(b)(1)(B).

## B. Vicarious Liability

### 1. Plaintiff Plead Vicarious Liability

GEICO argues that "Plaintiff's Complaint contains no count for vicarious liability. Nor does it allege any facts to establish vicarious liability against GEICO. In fact, it does not include the word 'vicarious' at all." (DE 96 at 4.) If a plaintiff's theory of recovery is premised on vicarious liability, the complaint must set forth sufficient factual allegations to support a vicarious liability claim. *See Legg v. Voice Media Grp., Inc.*, 13-62044-CIV, 2014 WL 2004383 at *4 (S.D. Fla. May 16, 2014); *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 981 F. Supp. 2d 1239, 1250 (S.D. Fla. 2013); *Broad. Music, Inc. v. Joint Bar & Grill, LLC*, 12-21209-CV, 2012 WL 6933552 at *3 (S.D. Fla. Dec. 11, 2012). A complaint filed in federal court based on federal question jurisdiction does not need to plead vicarious liability as a separate count. *See Platypus Wear, Inc. v. Clarke Modet & Co., S.L.*, 06-20976-CIV, 2008 WL 2557503 at *1 (S.D. Fla. June 23, 2008); *Legg*, 2014 WL 2004383 at *4. But contrary to GEICO's assertions, Plaintiff did adequately plead vicarious liability in the Complaint by alleging the following:

- In pursuit of collecting subrogation payments, GEICO partners with Defendant Bell to place unauthorized phone calls to consumers who allegedly owe money to GEICO (DE 1 ¶ 1).

- Defendant Bell, on GEICO's behalf, places repeated live and pre-recorded robocalls to consumers that inform them of alleged subrogation payments owed to GEICO (DE 1 ¶ 2).

10

- Defendants, through Defendant Bell, placed and continue to place repeated and harassing phone calls to consumers who GEICO claims owe it money related to insurance claims paid to third parties (DE 1 ¶ 15).

- GEICO utilizes Defendant Bell and others as a first line of attack to pressure consumers into paying the unproven subrogation payment (DE 1 ¶ 16).

- Through these calls, Defendant Bell indicated it was calling on behalf of Defendant GEICO to collect an alleged subrogation payment (DE 1 ¶ 19).

- Defendant GEICO and its agents, including Defendant Bell, made thousands of unsolicited phone calls to cellular telephone numbers belonging to Plaintiff and other members of the GEICO Cellular Telephone Class (DE 1 ¶ 32).

- Defendant GEICO directly, and through its agents, including Defendant Bell, utilized a predictive dialer to place numerous phone calls to Plaintiff (DE 1 ¶ 33).

- Defendant Bell made thousands of unsolicited phone calls on behalf of insurance carries, including Defendant GEICO (DE 1 ¶ 38).

- Defendant GEICO made, or had made on its behalf, unsolicited and unauthorized telephone calls using a prerecorded or artificial voice (DE 1 ¶ 44).

These allegations are sufficient to plead a cause of action based on vicarious liability. *See Legg*, 2014 WL 2004383 at *4 (allegation that messages were sent by defendant "or any party on behalf of" defendant was sufficient to plead vicarious liability); *Platypus Wear*, 2008 WL 2557503 at *1 (allegation that defendant "was and is an agent and/or employee and/or partner" of another defendant was sufficient to allege vicarious liability); *Imhoff Inv., LLC v. SamMichaels, Inc.*, 10-10996, 2014 WL 172234 (E.D. Mich. Jan. 15, 2014) (Plaintiff's allegation "that the facsimile was sent on behalf of Defendant in Paragraph 15 of its Complaint, which defines the class a 'holders of telephone numbers to which a facsimile transmission was sent on behalf of Defendant'" was sufficient to plead vicarious liability).

## 2. Vicarious Liability Under the TCPA

The TCPA makes it unlawful for any person to "make any call . . .  using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a paging service, cellular telephone service . . . for which the called party is charged for the call."  47 U.S.C. § 227(b)(1)(A)(iii).  The Court agrees with GEICO that because GEICO did not make or initiate any of the calls at issue in this action, there can be no direct liability against GEICO under the TCPA.   However, contrary to GEICO's assertions, a party can be vicariously liable for TCPA violations under federal common law principles of agency.  *See Sarris*, 981 F. Supp. 2d at 1248; *In re Joint Petition filed by Dish Network LLC*, 28 FCC Rcd. 6574 (2013).  In a recent declaratory ruling, the Federal Communications Commission ("FCC") concluded that,

> the seller may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers.  In this regard, we explain below that a seller may be liable for violations by its representaitves under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification. . . . While section 227(b) does not contain a provision that specifically mandates or prohibits vicarious liability, we clarify that the prohibitions contained in section 227(b) incorporate the federal common law of agency and that such vicarious liability principles reasonably advance the goals of the TCPA.

*Dish Network*, 28 FCC Rcd. at 6584, 6587.  Since the FCC's ruling, numerous courts have held that, under federal common law principles of agency, a party may be vicariously liable for TCPA violations even if that party did not initiate or make the calls at issue.[9]  *See e.g.*, *Legg*, 2014 WL 2004383 at *4; *Thomas v. Taco Bell Corp.*, 12-

---

[9] All of the cases relied upon by GEICO to support its argument that there is no vicarious liability under § 227(b) were decided prior to the FCC's ruling in *Dish Network*. GEICO also argues that *Dish Network* does not apply because "the analysis and

56458, 2014 WL 2959160 (9th Cir. July 2, 2014) ("[T]he district judge properly
concluded vicarious liability can provide the basis for liability for a TCPA violation.");
*Wagner v. CLC Resorts & Devs., Inc.*, 6:14-CV-281-ORL-31GJ, 2014 WL 3809130
(M.D. Fla. Aug. 1, 2014); *Cellco P'ship v. Plaza Resorts Inc.*, 12-81238-CIV, 2013 WL
5436553 (S.D. Fla. Sept. 27, 2013); *Smith v. State Farm Mut. Auto. Ins. Co.*, 13 C 2018,
2013 WL 5346430 (N.D. Ill. Sept. 23, 2013).

As the Court has explained, the FCC views agency broadly; a seller may be
liable for third-party acts under the federal common law principles of formal agency,
apparent authority, or ratification. *Sarris*, 981 F. Supp. 2d at 1249 (citing *Dish Network*,
28 FCC rcd. at 6584). Accordingly, the Court's analysis turns to whether GEICO is
entitled to summary judgment because no agency relationship existed.

### 3. Agency

The existence of agency is generally a question of fact. *See Legg*, 2014 WL
2004383 at *5. The party asserting the existence of an agency relationship has the
burden of proving it. *See Bogue Elec. Mfg. Co. v. Coconut Grove Bank*, 269 F.2d 1, 4
(5th Cir. 1959); *Johnson v. Unique Vacations, Inc.*, 498 F. App'x 892, 895 (11th Cir.

---

holdings in the FCC Order specifically address and relate to telemarketing activities that
are made for the purpose of selling a product or service." (DE 96 at 14.) The Court
does not believe that the FCC's ruling is as narrow as GEICO contends. While the
FCC's decision arose in the context of telemarketing calls, the FCC's ruling is broadly
applicable to TCPA violations. *See Dish Network*, 28 FCC Rcd. at 6587; *see also
Savanna Grp., Inc. v. Trynex, Inc.*, 10 C 7995, 2013 WL 4734004 at *5 (N.D. Ill. Sept. 3,
2013) (finding *Dish Network* "controlling" and applying agency principles in a case
involving the TCPA's prohibition on sending unsolicited faxes); *In the Matter of Rules &
Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559,
565 (2008) ("Similarly, a creditor on whose behalf an autodialed or prerecorded
message call is made to a wireless number bears the responsibility for any violation of
the Commission's rules. Calls placed by a third party collector on behalf of that creditor
are treated as if the creditor itself placed the call.").

2012).  When a party bearing the burden of proving agency fails to produce evidence in support of its allegations or where the evidence presented is so unequivocal that reasonable persons could reach but one conclusion, a court may determine the lack of agency as a matter of law.  *See Unique Vacations*, 498 F. App'x at 896; *Pardo v. Tanning Research Labs., Inc.*, 996 F. Supp. 1222, 1225 (M.D. Fla. 1998) *aff'd sub nom. Pardo v. Tanning Research Labs. Inc.*, 170 F.3d 187 (11th Cir. 1999); *Spitz v. Proven Winners N. Am., LLC*, 13-3084, 2014 WL 3558030 at *5 (7th Cir. July 21, 2014) ("Agency is a notoriously fact-bound question, but summary judgment on the existence of an agency relationship is still appropriate when the plaintiff fails 'to meet her burden in presenting sufficient facts to show that a genuine issue of material fact exists with respect to the agency issue.'").

### a.  Formal Agency

Agency is the "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."  Restatement (Third) of Agency §1.01.  In an actual agency relationship, the principal has a right to control the actions of the agent and the agent has the power to affect the legal rights and duties of the principal.  Restatement (Third) Of Agency § 1.01.  Absent control, formal agency does not exist.  *Mais v. Gulf Coast Collection Bureau, Inc.*, 944 F. Supp. 2d 1226, 1243-45 (S.D. Fla. 2013).

Specifically, the principal must have the right to control "the manner and method of work carried out by the agent," and the agent must be able to affect the legal relationships of the principal.  *Bridgeview Health Care Ctr. Ltd. v. Clark*, 09 C 5601,

2013 WL 1154206 at *5 (N.D. Ill. Mar. 19, 2013); *Thomas v. Taco Bell Corp.*, 879 F.

Supp. 2d 1079, 1084 (C.D. Cal. 2012) *aff'd*, 12-56458, 2014 WL 2959160 (9th Cir. July

2, 2014); *Mais*, 944 F. Supp. 2d 1243-45 (the right of control over the mode of doing the

work is the principal consideration in an agency determination); *Tianello*, 860 F. Supp.

at 1524 ("If a party controls only the outcome of the endeavor, and not the means used

to achieve the outcome, then an agency relationship does not exist."); *Haynes v. Wilder*

*Corp. of Delaware*, 721 F. Supp. 2d 1218, 1225 (M.D. Fla. 2010) (the principal must

have "the right or power to control and direct the physical conduct of the other in the

performance of the act.  If there is no right to control, there is no liability.").  Agency

requires "more than mere passive permission; it involves request, instruction or

command." *Taco Bell Corp.*, 879 F. Supp. 2d at 1084-85 (quoting *Klee v. United States*,

53 F.2d 58, 61 (9th Cir. 1931)).  "Whether the requisite degree of control is present can

be resolved on summary judgment when the evidence is clear, undisputed, and capable

of only one determination." *Mais*, 944 F. Supp. 2d at 1244.

To succeed on an actual agency theory, Plaintiff must demonstrate that Bell was

GEICO's agent.  The three pieces of evidence offered by Plaintiff in support of his

agency argument are insufficient to create a question of material fact regarding the

existence of an agency relationship.  First, Plaintiff argues that because GEICO

"provided Bell the purported debtors' telephone numbers expecting that Bell would

make calls to those individuals in an effort to collect suborgation payments on its

behalf," an agency relationship existed between the parties (DE 140 at 5; *see also* DE

137-1 ¶ 20 ["GEICO . . . expected that Bell would make calls to individuals"]).  Agency

requires more than passive awareness or permission; the fact that GEICO knew or

assumed that Bell was placing calls or sending letters as part of its recoupment efforts does not demonstrate that GEICO had any control over those methods.  *See Taco Bell Corp.*, 879 F. Supp. 2d at 1086 (knowledge of the details of a text message campaign, including the intended recipients and language of the message, approval of the campaign, and funding the campaign were insufficient to establish agency because there was no evidence of any control over the manner and means of the text message campaign).

Second, Plaintiff argues an agency relationship existed because GEICO could monitor the claims it referred to Bell through the online portal (DE 140 at 5).  However, there is no evidence that GEICO could direct, control, or manage the way in which Bell handled the claims.  The ability to monitor the status of a specific claim, without more, is not indicative of the control necessary for an agency relationship.

Finally, Plaintiff suggests that because GEICO received complaints about Bell's calls and because GEICO would at times direct Bell to close a file, an agency relationship existed.  GEICO's ability to direct Bell to close and return a previously referred file does not demonstrate the existence of an agency relationship.  And while Mr. Bateman testified that while GEICO discussed at least one such complaint with Bell, GEICO did not respond by directing Bell to act in a certain manner or to change its methods (Bateman Dep. 44:4-14).  Moreover, following any such complaints, Bell, not GEICO, chose whether, and if so how, to discipline or retrain its employees (Bouvier Dep. 143:5-148:12).

The evidence presented to the Court demonstrates that no agency relationship existed.  First, there is no evidence that GEICO or Bell manifested assent to an agency

relationship.[10]   *See F.T.C. v. Sterling Precious Metals, LLC*, 12-80597-CIV, 2013 WL 1442180 at *5 (S.D. Fla. Apr. 9, 2013) ("[U]nder the common law understanding of agency, Sterling cannot claim to have been an agent of Worth unless and until both parties have indicated a desire to create an agency relationship."); *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003) (holding there was no agency relationship between two companies absent an acknowledgment by the parties that one acted on behalf of another).

Second, there is no evidence that GEICO controlled, or had the right to control, Bell in any manner, much less any evidence that GEICO controlled, or had the right to control, the manner and methods Bell employed in its recovery efforts.   Mr. Bouvier testified that GEICO was not involved in Bell's operations and that GEICO and Bell never discussed the specific manner in which Bell conducts its subrogation business.[11]

---

[10]  *See* Bouvier Dep. 25:22-26:7 ("Q: That's fine.  And is defendant GEICO a business partner of Bell?  A:  We'd like to think of our relationships as a partnering relationship. However, in the context of definitions, I'm not sure what is meant when you put forth the topic 'business partner.' Q: Is GEICO – defendant GEICO a client of Bell?  A:  Yes.").

[11]  *See* Bouvier Dep. 41:8-21 ("Q: [W]as there an understanding between Bell and GEICO as to how Bell would carry out its business? A: Okay. No.  You know, if you're asking me if GEICO was involved, whether it'd be defendant GEICO or claims center GEICO was involved in our process, the answer is no; or was knowledgeable, but probably is no. Q: Why do you say that?  A:  Well, to my knowledge, it was never discussed or covered or gone into and, further, to my knowledge, it normally isn't."); *see also* Bateman Dep. 34:23-35:13 ("Q: You would refer to these claims – your employees would refer these claims to third parties and you had no idea what those third parties were doing to collect money?  Q: I remind you that you're under oath when you answer these questions.  A: I understand.  I don't know the exact things that they did.  I don't – I never had the interaction with them to discuss the methods in which they went about recovering money.  Can I assume that they made outbound calls?  Sure.  Can I assume that they sent letters? Sure.  Did I go to their facility to witness that happen? No, I did not.  Did I listen to any calls to know if they were inbound or outbound?  No, I did not. So I don't know for sure what they did.").

According to Mr. Bateman, it was within Bell's discretion to determine how to recover funds,[12] and GEICO never instructed Bell to make, or to refrain from making, phone calls as part of its general recovery efforts.[13]  Nor is there any evidence that GEICO instructed, or could instruct, Bell to send letters or to manually place calls or to place calls using an automated system or pre-recorded voice.  To the contrary, Mr. Bouvier testified that it was up to Bell's employees to decide whether to place manual calls, how many calls to place, and whether to use LiveVox on any particular claim (Bouvier Dep. 82:5-12, 117:1-118:2, 120:1-12, 122:20-123:2).  And with respect to LiveVox, there is no evidence that Bell discussed its use of LiveVox with GEICO or that GEICO directed or could direct Bell to use, or refrain from using, LiveVox or any other automated dialing system (Bouvier Dep. 133:17-134:4).  Moreover, there is no evidence that GEICO played any role in creating, developing, or directing the alleged violative phone calls; rather, as Plaintiff alleges, it was Bell who approved the message left by LiveVox (*see* DE 140 at 4 [stating that LiveVox "automatically played a prerecorded messaged approved by Bell."]).

Third, there is no evidence that GEICO played any role in the hiring, training, supervising, or disciplining of Bell's employees; indeed, all of the testimony shows that Bell maintained exclusive control over those decisions (Bouvier Dep. 102:10-109:10).

---

[12] *See* Bateman Dep. 77:6-10 ("Q: So you would expect them to take the same steps as GEICO does prior to transferring the file in order to collect? A: I don't expect – I expect them to do whatever their business model tells them to do."); 29:17-21 ("Q: In what manner does Bell go about collecting GEICO subrogation claims? A: I have no knowledge of how they collect their debt.").

[13] *See* Bateman Dep. 74:10-15 ("Q: Did you ever, by you, I mean you personally and/or any other GEICO employee that you're aware, give specific instructions to Bell to not make phone calls to the files that you were referring to them?  A:  No, I never gave Bell the indication that we didn't want them to make phone calls.").

*See Commodity Futures Trading Comm'n v. Gibraltar Monetary Corp.*, 575 F.3d 1180, 1190 (11th Cir. 2009) (considering hiring, training, supervisory and disciplinary authority in determining the existence of an agency relationship).  And GEICO never provided Bell with any instructions, manuals, or policies regarding the TCPA (Bateman Dep. 57:25-58:4).

In sum, considering all of the evidence in the light most favorable to Plaintiff, there is simply no evidentiary support for the existence of an actual agency relationship between Bell and GEICO.  Accordingly, GEICO is entitled to summary judgment as to Bell's actual agency theory of liability.

### b.  Apparent Authority

To establish the existence of apparent authority, Plaintiff must prove:  (1) a representation by the purported principal; (2) reliance on that representation by a third party; and (3) a change in position by a third party in reliance upon such a relationship. *See Nat'l Auto Lenders, Inc. v. SysLOCATE, Inc.*, 686 F. Supp. 2d 1318, 1322 (S.D. Fla. 2010) *aff'd*, 433 F. App'x 842 (11th Cir. 2011).  Only the actions or representations of the principal can create apparent authority; the purported agent cannot create apparent authority by his own actions or representations. *Id.*; *Taco Bell Corp.*, 2014 WL 2959160 at *2 (analyzing apparent authority under the TCPA which "can only be established by proof of something said or done by the [alleged principal], on which [the plaintiff] reasonably relied.") (quoting *NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity*, 124 F.3d 1094 (9th Cir. 1997)); Restatement (Second) of Agency § 265 cmt. A ("Apparent authority exists only as to those to whom the principal has manifested that an agent is authorized.").  As Plaintiff recognizes, apparent authority holds a principal

19

liable when a third party reasonably believes agency exists and that belief is "traceable to the principal's manifestations." (DE 140 at 18.)

The undisputed facts of this case cannot support a theory of liability premised on apparent authority. Plaintiff cannot identify any representations, manifestations, or actions taken by GEICO, the purported principal, upon which Plaintiff, or anyone else, relied.[14] Plaintiff offers only that "when Bell called purported debtors, it stated that GEICO was seeking to collect on the unpaid claims, gave the value of the claims, and explained how individuals could stop the calls." (DE 140 at 18-19.) However, those statements were made by Defendant Bell, the purported agent, and are not traceable to any action or representation made by GEICO to Plaintiff. There is no evidence that GEICO made any representations to Plaintiff regarding Bell or that Plaintiff relied on any representation by GEICO. Because Plaintiff has offered no facts to support his claim of apparent agency, GEICO is entitled to summary judgment on this theory.

---

[14] Plaintiff relies heavily on the FCC's "guidance" in *Dish Network* to support its apparent authority arguments, arguing that apparent authority exists when a principal: (1) allows the purported agent access to information that would normally be within the principal's exclusive control; (2) allows the purported agent to use its trade name; and (3) knows that the purported agent is violating the TCPA and fails to take effective steps within its power to force the agent to stop. (DE 140 at 18-19.) Plaintiff contends that GEICO's actions here satisfy each of those indicia of apparent authority (DE 140 at 18-19). Such allegations are insufficient to establish apparent authority. Courts and the FCC have agreed that the "guidance in question has no binding effect on courts [and] that it is not entitled to deference." *See Dish Network, L.L.C. v. Fed. Commc'ns Comm'n*, 552 F. App'x 1 (D.C. Cir. 2014); *see also Smith v. State Farm Mut. Auto. Ins. Co.*, 13-CV-2018, 2014 WL 3906923 (N.D. Ill. Aug. 11, 2014); *Creative Montessori Learning Ctr. v. Ashford Gear, LLC*, 09 C 3963, 2014 WL 865963 (N.D. Ill. Mar. 3, 2014). The force of the guidance is dependent entirely on its power to persuade. *Dish Network,* 552 F. App'x 1. Based on the facts before the Court and in light of the well-known federal common law principles of apparent agency, the FCC's "guidance" fails to persuade the Court that an apparent agency relationship exists between GEICO and Bell.

## c. Ratification

In order to prove vicarious liability through ratification, the Plaintiff bears the burden of showing:  (1) the existence of a principal-agent relationship; (2) that the principal accepted the benefits of the unauthorized act; (3) with full knowledge of the facts under circumstances demonstrating the intent to adopt the unauthorized agreement.  *Taco Bell Corp.*, 2014 WL 2959160 at \*2; *Sarris*, 981 F. Supp. 2d at 1253. While a principal may become liable for the acts of its agent when it ratifies an originally unauthorized act, the existence of a principal-agent relationship is a pre-requisite for ratification.  *Taco Bell Corp.*, 2014 WL 2959160 at \*2 ("Although a principal is liable when it ratifies an originally unauthorized tort, the principal-agent relationship is still a requisite, and ratification can have no meaning without it."); *Irwin v. Miami-Dade Cnty. Pub. Sch.*, 06-23029-CIV, 2008 WL 2977360 at \*4 (S.D. Fla. July 31, 2008) *aff'd*, 398 F. App'x 503 (11th Cir. 2010) ("A count brought under a theory of ratification requires a principal-agent relationship.").  Because no agency relationship existed between Bell and GEICO, Plaintiff cannot proceed under a ratification theory.

Even if the existence of prior agency relationship were not a pre-requisite to ratification, GEICO would still be entitled to summary judgment.  Bell's ratification theory of liability hinges on two arguments:  (1) the fact that GEICO received "subrogation payments as a result of Bell's overarching illegal calling campaign" and (2) Plaintiff's belief that GEICO knew Bell's practices violated the TCPA (DE 140 at 20).  The fact that GEICO benefited from its business relationship with Bell is insufficient to establish an agency relationship.  *See Haynes,* 721 F. Supp. 2d at 1225 ("The mere fact that the organized events benefit the defendant's rental property fails to create an agency;

mutual benefit alone remains insufficient."). And Plaintiff has failed to demonstrate that GEICO had full knowledge of the facts and circumstances of the unauthorized acts, *i.e.*, the LiveVox calls. Rather, Mr. Bateman's testimony is replete with statements that he did not specifically know what actions Bell was taking to recover funds. In addition, Mr. Bouvier testified that he was not aware of any Bell employee ever discussing the use of LiveVox with GEICO. For these reasons, Plaintiff's ratification theory of liability must fail and GEICO is entitled to summary judgment.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that GEICO's Motion for Summary Judgment (DE 96) is **GRANTED**. The claims against GEICO are **DISMISSED**.

**DONE AND ORDERED** in chambers in Miami, Florida, this 17th day of September, 2014.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE